[Civ. No. 10191. Third Dist. Mar. 26, 1962.]

THE PEOPLE ex rel. STANLEY MOSK, as Attorney General, Plaintiff and Respondent, v. NATIONAL RESEARCH COMPANY OF CALIFORNIA et al., Defendants and Appellants.

Murray M. Chotiner for Defendants and Appellants.

Stanley Mosk, Attorney General, Preble Stolz and John Michael Traynor, Deputy Attorneys General, for Plaintiff and Respondent.

SPARKS, J. pro tem.*—This appeal is from a judgment entered in favor of the People in an action brought on relation of the Attorney General to restrain defendants from continuing in certain business practices alleged to be unfair, deceptive and fraudulent.

After a trial, at which stipulations were entered into as to many of the facts, the court granted a permanent injunction enjoining defendants from "Using, or placing in the hands of others for use in California" certain mailing materials designed and intended for use in obtaining information by subterfuge concerning delinquent debtors. The specific type enjoined was any form, questionnaire, card or other printed or written material which:

". . . *Simulates, directly or indirectly, any form in general use by the government of the United States or of the State of California, or of any of their agencies or political subdivisions; or*

"

---

*Assigned by Chairman of Judicial Council.

". . . *Quotes from, or gives citations to, or states the substance of any provision of law, . . . excepting only that the substance of provisions of law relating directly to the collections of debts and the remedies of creditors may be stated on the form provided that the name of the creditor and the sum of the debt are prominently stated on the same form.*" (Italics added.)

The use on said materials of certain words or abbreviations commonly used in the title of government offices, such as "United States," "State of California," etc., was forbidden. Defendants were also enjoined from using forms which do not clearly reveal that the purpose for which the information was requested was that of obtaining information concerning delinquent debtors.

The plaintiff's complaint was directed particularly at three of defendants' forms, which purported to come from the "Bureau of Verification" or the "Bureau of Reclassification" in Sacramento, California. These materials were quite similar in appearance to official forms used by the Departments of Motor Vehicles and Employment, and cited penal provisions of the Vehicle and Unemployment Insurance Codes. Information sought to be elicited by the cards was the addressee's residence, operator's license number, vehicle license number, make of vehicle owned, legal owner or lien holder of vehicle, business or employment, business address, employer's name, Social Security number, new employer's address, and occupation.

Defendants sold these forms, known in the trade as "skip-tracers," to creditors and to various California organizations interested in collecting delinquent debts and locating debtors who had departed without leaving a forwarding address. The purchasers of the forms would insert the last known addresses of delinquent debtors and return the forms to defendants who mailed them from Sacramento. Defendants then relayed the filled-in forms, as they were received, to the respective creditor organization.

The trial court found: "That the uses . . . of the defendants' printed material containing the unfair, untrue, misleading, and deceptive representations . . . have had, and now have, the tendency and capacity to, and do, mislead and deceive many persons, to whom the said printed material is sent, into the erroneous and mistaken belief that the representations and implications were true and induced the recipients

thereof to give information to defendants and their purchasers which otherwise would not have been supplied.

"That the aforementioned conduct of the defendants constitutes a serious and continuing fraud upon the People of the State of California, and which has and continues seriously to embarrass and increase the costs of the operation of the Department of Motor Vehicles and the Department of Employment of the government of the State of California.

"That the activities of the defendants have and will continue unless restrained to confuse the public and disrupt the normal operations of the Department of Motor Vehicles and the Department of Employment. Each new mailing of the defendants confuses numerous persons who receive them into believing that they come from the Department of Motor Vehicles or the Department of Employment. This confusion in turn leads to public hostility towards the said Departments and seriously imperils the heretofore high degree of public acceptance of the mailings of the said Departments."

The conclusions of the court were:

"1. That the defendants have engaged in unfair competition as defined in Civil Code section 3369.

"2. That the plaintiff is entitled to an injunction restraining the defendants from selling, handling, or otherwise dealing from Sacramento, California, Washington, D. C., or any other place, in forms which are misleading as to their source and purpose, or which simulate forms of the government of the State of California, or any of its agencies or political subdivisions.

"3. That the plaintiff is not entitled to an injunction based on the failure of the defendants to be licensed as either a private investigator or a collection agency."

Appellant contends first that the injunction was not authorized for the reason that the applicable code section refers to "unfair competition," and that what it seeks to prohibit is certain conduct in the realm of *business competition*. The statutory definition, as set forth in subdivision 3 of section 3369 of the Civil Code, reads: ". . . unfair competition shall mean and include unfair or fraudulent business practice and unfair, untrue or misleading advertising and any act denounced by Penal Code sections 654a, 654b or 654c."[1]

---

[1]Penal Code sections 654a, 654b, and 654c, named in Civil Code section 3369, were repealed in 1941. The subject matter thereof now appears as Business and Professions Code sections 17500-17502, 17530,

Historically, the law of unfair competition and of trademark infringement evolved in the general field of torts.[2] It was concerned primarily with wrongful conduct in commercial enterprises which resulted in business loss to another, ordinarily by the use of unfair means in drawing away customers from a competitor. With passage of time and accompanying epochal changes in industrial and economic conditions, the legal concept of unfair competition[3] broadened appreciably. This was occasioned, according to the Restatement, partly by the flexibility and breadth of relief afforded by equity, and partly by changing methods of business and changing standards of commercial morality. "[T]he tendency of the law, both legislative and common, has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade. *The tendency still persists.*" (Italics added.) (Rest., Torts, p. 540.)

This development of the law is clearly reflected in California by the legislative enactments noted, *supra,* and by judicial decision in the extension of equitable relief to situations beyond the scope of purely business competition. (*Athens Lodge No. 70* v. *Wilson,* 117 Cal.App.2d 322 [255 P.2d 482] ; *Academy of Motion Picture Arts & Sciences* v. *Benson,* 15 Cal.2d 685 [104 P.2d 650] ; *Jackman* v. *Mau,* 78 Cal.App.2d 234 [177 P.2d 599] ; *Winfield* v. *Charles,* 77 Cal.App.2d 64 [175 P.2d 69] ; *Schwartz* v. *Slenderella Systems of Calif.,* 43 Cal.2d 107 [271 P.2d 857] ; *MacSweeney Enterprises, Inc.* v. *Tarantino,* 106 Cal.App.2d 504 [235 P.2d 266].)

In the *Athens Lodge* case it was contended that section 3369 was limited to unfair business competition and could not include unfair competition against a fraternal organization. In disposing of the contention, the court stated: "While defendants' construction is a possible one it is not a compelling one. In subdivision 3 there is no limitation of 'unfair, untrue or misleading advertising' to business advertising. Moreover, the very language in that subdivision, 'unfair competition' 'shall mean *and include*' the situations thereafter set

---

and 17531, and relates to the dissemination of false or misleading statements to the public.

[2]See Prosser, Torts (2d ed. 1955) section 107, page 745 et seq.; Rest., Torts, pages 538-539; Nims, Unfair Competition and Trade-Marks (4th ed. 1947) sections 7-9, pages 40-51.

[3]The Committee on Torts of the American Law Institute uses the phrase "*trade practices*" rather than the word "*competition*" as the classification rubric of its chapters on the subject.

forth, shows that the definition is *not restrictive or exclusive.*" (Last italics added.) (*Athens Lodge No. 70* v. *Wilson, supra,* 117 Cal.App.2d at p. 325.)

In 47 California Jurisprudence, second edition, Trademarks, Trade Names and Trade Practices, section 25, page 741, the trend is summarized as follows: "Although a few cases regard direct competition between the parties as an essential element of unfair competition, the current trend is to redefine the action as one against unfair business practices, rather than unfair competition, and, as a general rule, competition is not regarded as a necessary ingredient."

We conclude that the equitable relief authorized by Civil Code section 3369 is not circumscribed by any prerequisite showing that the conduct in question be limited to the field of business competition.

The very breadth of the terms used by the Legislature indicate, in our judgment, an intent to be inclusive rather than restrictive in the practices to be enjoined. We refrain from construing the language narrowly in a field where the trend is opposed to unfair trade practices which affect the public interest. As our Supreme Court has stated: " 'It is also to be borne in mind that the rules of unfair competition are based, not alone upon the protection of a property right existing in the complainants, but also upon the right of the public to protection from fraud and deceit. . . .' " (*Academy of Motion Picture Arts & Sciences* v. *Benson, supra,* 15 Cal.2d at p. 691.)

The foregoing discussion is also apropos to appellants' further argument that section 3369 is unconstitutionally void for uncertainty and vagueness. In view of the presumption of constitutionality (*In re Madera Irrigation Dist.,* 92 Cal. 296 [28 P. 272, 675, 27 Am.St.Rep. 106, 14 L.R.A. 755]; *City & County of San Francisco* v. *Industrial Acc. Com.,* 183 Cal. 273 [191 P. 26]; *City of Ojai* v. *Chaffee,* 60 Cal.App.2d 54 [140 P.2d 116]; *Bowker* v. *Baker,* 73 Cal. App.2d 653 [167 P.2d 256]), a statute that imposes no penalties will not be held void for uncertainty if any reasonable and practical construction can be given to its language. (*Tulare County* v. *Dinuba,* 188 Cal. 664 [206 P. 983]; *Lockheed Aircraft Corp.* v. *Superior Court,* 28 Cal.2d 481 [171 P.2d 21, 166 A.L.R. 701].) Its terms will be upheld if the language used may be clarified by reference to the

Legislative purpose and intent regarding evils to be combatted. (*Lockheed Aircraft Corp.* v. *Superior Court, supra; People* v. *Hallner,* 43 Cal.2d 715 [277 P.2d 393]; *Sultan Turkish Bath, Inc.* v. *Board Police Comrs.,* 169 Cal.App.2d 188 [337 P.2d 203].) ▮▮ ''A statute designed to protect the public good must be upheld unless its nullity clearly, positively and unmistakably appears. [Citing cases.] ▮▮ Where doubt arises as to the correct construction of a statute, such doubt must be resolved if possible in harmony with the Constitution and it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language.'' (*Lawton* v. *Board of Medical Examiners,* 143 Cal.App.2d 256, 261 [299 P.2d 362].)

▮▮ ''Unfair competition'' and ''unfair or fraudulent business practice,'' are generic terms. Like the terms ''nuisance'' or ''negligence'' they must be translated into specific situations of fact in order to be cognizable. The attribute of generality does not of itself, however, require a holding of nullity for vagueness. As we have seen, the concept of unfair competition runs deep in the stream of our jurisprudence, and has been considered in numerous cases, articles and texts. (Prosser, Torts, § 107, pp. 750-754; Nims, Unfair Competition and Trade-Marks [4th ed. 1947].) There is thus a definite background of experience and precedence to illuminate the meaning of the words employed in the statute. No one need reasonably be misled thereby.

Furthermore, it would be impossible to draft in advance detailed plans and specifications of all acts and conduct to be prohibited (*Lawton* v. *Board of Medical Examiners,* 143 Cal. App.2d 256 [299 P.2d 362]; *Sultan Turkish Bath, Inc.* v. *Board Police Comrs.,* 169 Cal.App.2d 188 [337 P.2d 203]), since unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery. We hold, therefore, that the questioned language of section 3369 is not void for uncertainty and vagueness. ▮▮ What constitutes ''unfair competition'' or ''unfair or fraudulent business practice'' under any given set of circumstances is a question of fact (*Grant* v. *California Bench Co.,* 76 Cal.App.2d 706, 707 [173 P.2d 817]), the essential test being whether the public is likely to be deceived (*Family Record Plan, Inc.* v. *Mitchell,* 172 Cal.App.2d 235 [342 P.2d 10]).

Parallel holdings are found in the federal jurisdiction. Although the wordings of the state and federal statutes are

not identical, the differences are not of a degree to impair comparison.[4] To us the expressions "unfair or fraudulent business practice" and "unfair or deceptive acts or practices in commerce," as used respectively in the two statutes, appear practically synonymous. It is clear from the decisions under the federal act that the Federal Trade Commission has the power to enjoin any acts and practices which are unfair or deceptive to the public generally, regardless of their effect on private competition. (*Pep Boys—Manny, Moe & Jack* v. *Federal Trade Com.*, 122 F.2d 158; *Armand Co.* v. *Federal Trade Com.*, 78 F.2d 707; *Standard Distributors* v. *Federal Trade Com.*, 211 F.2d 7; *Federal Trade Com.* v. *Rhodes Pharmacal Co.*, 191 F.2d 744; *DeJay Stores* v. *Federal Trade Com.*, 200 F.2d 865.) In view of the similarity of language and obvious identity of purpose of the two statutes, decisions of the federal court on the subject are more than ordinarily persuasive.

The record before us discloses that appellants Mohr and Floersheim appeared before the Federal Trade Commission in 1956, at which time they were ordered to cease and desist from using material which implied that the information requested was for any purpose other than obtaining information concerning delinquent debtors. The proceedings were reopened in 1958, and the cease and desist order theretofore granted was modified so as to prevent the "Using, or placing in the hands of others for use, any forms, questionnaires or other materials, printed or written, which do not clearly reveal that the purpose for which the information is requested is that of obtaining information concerning delinquent debtors." The action of the commission in reopening the proceeding and of granting a modification of its order was affirmed. (*Mohr* v. *Federal Trade Com.*, 272 F.2d 401, cert. denied, 362 U.S. 920 [80 S.Ct. 672, 4 L.Ed.2d 739].) As a result of this and other decisions (*Silverman* v. *Federal Trade Com.*, 145 F.2d 751; *Rothschild* v. *Federal Trade Com.*, 200 F.2d 39; *Bennett* v. *Federal Trade Com.*, 200 F.2d 362; *Bernstein* v. *Federal Trade Com.*, 200 F.2d 404; *DeJay Stores* v. *Federal Trade Com.*, 200 F.2d 865) it is definitely established that the use of materials and systems such as were enjoined in the instant case have been held deceptive and unfair by

---

[4] United States Code Annotated, section 45 of title 15, reads in part: "(a) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

the federal courts and have been forbidden in interstate commerce.

Following the modification of the cease and desist order referred to above, and pending the appeal in the *Mohr* case, *supra,* the forms complained of appeared in California exclusively for intrastate use. Under the circumstances as disclosed by the record we cannot conclude that the California statute is too vague or uncertain to challenge the identical practice banned as unfair and deceptive in commerce among the states. The authority and power of the Attorney General to seek injunctive relief on behalf of the public appears in the act itself. Absent a legislative declaration, equity will, of course, hesitate to interfere where standards of public policy can be enforced adequately by resort to criminal law. (*Nathan H. Schur, Inc.* v. *City of Santa Monica,* 47 Cal.2d 11 [300 P.2d 831]; *People* v. *Brophy,* 49 Cal.App.2d 15 [120 P.2d 946]; *International Assn. of Cleaning & Dye House Workers* v. *Landowitz,* 20 Cal.2d 418 [126 P.2d 609].) This rule can be of no solace, however, where the statute specifically provides, as it does in section 3369, for injunctive relief in instances of unfair competition, and authorizes the Attorney General to prosecute actions for injunctions in the name of the people.

Was the judgment granting an injunction too broad? Appellants present several facets to their contentions in this respect. The first concerns the extension of the effect of the decree to activities of the defendants outside of the State of California. (Appellants were restrained from engaging in any of the following acts, whether done in California or elsewhere: (1) using or placing in the hands of others for use in California any of the proscribed forms; and (2) processing, selling, or otherwise handling any of the proscribed forms or materials which were to be sent to or have been received from any person in the State of California.) This was not within the issues framed by the pleadings, argue appellants, since the complaint sought to enjoin only the use of certain forms designed exclusively for intrastate business. Furthermore, it is contended that interstate communication of a business nature by means of the mails is interstate commerce regulable only by Congress under the Constitution and precludes regulations by the State of California; and that reference to the use of the United States mail should not have been made a part of the judgment.

It is true that the activities of the defendants originally

sought to be enjoined concerned only the use of three forms, particularly described in the complaint and copies attached thereto. These forms were designed for use exclusively in the State of California. At the trial numerous variations of the three forms complained of were received in evidence. All of these latter forms were to be returned to Washington, D. C., instead of Sacramento. One of these forms, according to the record, appeared in this state shortly before the trial of the action. It is substantially similar to one of the forms sought to be enjoined by the complaint, except that it had been mailed from Washington, D. C., and directed the recipient to return it to that address. Respondent suggests that this deviation in technique during the course of the action could have been induced by the enactment of section 146b of the Penal Code which became effective in September 1959.[5]

Irrespective of the reasons therefor, the record supports the conclusion that defendants displayed great ingenuity and resourcefulness in diversifying the types of forms employed and systems used. Undoubtedly, the trial court had in mind this protean proclivity of the defendants when it framed its judgment. In any event, we find no abuse of discretion or excess in the use of equitable remedies in the decree as granted. ▇ Equity is not limited in the scope or type of relief which may be granted. Its decrees are molded in accordance with the exigencies of each case and the rights of the persons over whom it has acquired jurisdiction. (1 Pomeroy, Equity Jurisprudence [5th ed. 1941], Judgments in Equity, §§ 115-117, pp. 154-158; *Strain* v. *Security Title Ins. Co.*, 124 Cal.App.2d 195 [268 P.2d 167]; *Santa Monica Ice & Cold Storage Co.* v. *Rossier*, 42 Cal.App.2d 467 [109 P.2d 382]; *Hercules Glue Co.* v. *Littooy*, 45 Cal.App.2d 42 [113 P.2d 490]; *Rolapp* v. *Federal Bldg. & Loan Assn.*, 11 Cal. App.2d 337 [53 P.2d 974].) As the court said in the early case of *Wickersham* v. *Crittenden*, 93 Cal. 17, 32 [28 P. 788]: ''It is often necessary, in order that the plaintiff may obtain full justice, that the relief granted him be as varied and diversified as the means that have been employed by the

[5]Penal Code section 146b reads: ''Every person who, with intent to lead another to believe that a request or demand for information is being made by the State, a county, city, or other governmental entity, when such is not the case, sends to such other person a written or printed form or other communication which reasonably appears to be such request or demand by such governmental entity, is guilty of a misdemeanor.''

defendant to produce the grievance complained of.''

Having assumed jurisdiction of the parties and of the subject matter, equity will attempt to make final disposition of the controversy and to that end will render a decree sufficiently comprehensive. (*Rolapp* v. *Federal Bldg. & Loan Assn., supra; Santa Monica Ice & Cold Storage Co.* v. *Rossier, supra; Hercules Glue Co.* v. *Littooy, supra.*) In doing so, it may take into consideration circumstances existing at the time the decree is rendered, rather than the facts that attend the commencement of the action. (*Mercer Cas. Co.* v. *Lewis,* 41 Cal.App.2d 918 [108 P.2d 65]; *Rosicrucian Fellowship* v. *Rosicrucian etc. Church,* 39 Cal.2d 121 [245 P.2d 481].)

In the matter before us, the defendants were ordered to desist from certain conduct unless performed in a specific way. The circumstance that the decree was given an extraterritorial effect does not impair its validity. In granting injunctive relief the court acted in personam against the defendants, and it is immaterial that the control it asserts over their actions extends beyond the boundaries of California. (*Title Ins. & Trust Co.* v. *California Dev. Co.,* 171 Cal. 173 [152 P. 542]; *Taylor* v. *Taylor,* 192 Cal. 71 [218 P. 756, 51 A.L.R. 1074]; *Promis* v. *Duke,* 208 Cal. 420 [281 P. 613]; *Tomaier* v. *Tomaier,* 23 Cal.2d 754 [146 P.2d 905]; *Tischhauser* v. *Tischhauser,* 142 Cal.App.2d 252 [298 P.2d 551]; *Mills* v. *Mills,* 147 Cal.App.2d 107 [305 P.2d 61]; *Rozan* v. *Rozan,* 49 Cal.2d 322 [317 P.2d 11].)

Mr. Witkin states the rule succinctly: ''A court with personal jurisdiction of the defendant may enjoin him from doing an act elsewhere, even from instituting a law suit.'' (1 Witkin, Cal. Procedure, Jurisdiction, § 57, p. 327.) Although the defendants in the instant case were enjoined from engaging in the specific acts in California, *or elsewhere,* nevertheless the effect of the decree was limited to materials to be sent to or received in California and used in this state. In view of the fact that the decree operates solely upon the persons of the defendants, concerns acts which culminate in California, and affects only the residents thereof, we perceive no unwarranted interference with federal function or prerogative. We have not been furnished with nor have we noted any precedent authority which impels the conclusion that the field of unfair, fraudulent or deceptive business practices has been preempted by federal enactment to the exclusion of state control and regulation. The similarity of the statutes of the two

jurisdictions in relation to unfair business practices indicates, on the contrary, a common purpose and must be considered as supplementing each other, rather than being in conflict. The power of a state to protect its citizens from unfair, deceptive and fraudulent practices is not to be defeated because the use of the mails in interstate communication may be involved. The fundamental inquiry in such instances is whether the state legislation is in conflict with national policy. (*California v. Zook*, 336 U.S. 725 [69 S.Ct. 841, 93 L.Ed. 1005]; *Alfred M. Lewis, Inc.* v. *Warehousemen T.C. & H. Local Union*, 163 Cal. App.2d 771 [330 P.2d 53]; *Meyers* v. *Mathews*, 270 Wis. 453 [71 N.W.2d 368, 54 A.L.R.2d 868]; *People* v. *Gordon*, 105 Cal. App.2d 711 [234 P.2d 287]; *In re Phoedovius*, 177 Cal. 238 [170 P. 412]; *Travelers Health Assn.* v. *Commonwealth*, 188 Va. 877 [51 S.E.2d 263].) In summary on this point, we are of the opinion that the trial court did not overreach its equitable powers in granting the instant decree, nor exceed the exigencies of the situation, as shown by the record, by the breadth of the terms used. We note further that the general language of the injunction is the same as that used in the cease and desist order issued by the Federal Trade Commission in *Mohr* v. *Federal Trade Com.*, *supra*, 272 F.2d 401.

 Another contention made by appellants is that we are living in an era of forms, IBM cards, public opinion polls, surveys, and numerous requests for information, and that the State of California has no monopoly on the use of forms or questionnaires. Conceding the correctness of such statement, the factual gravamen before the court nevertheless was whether or not governmental forms were unfairly simulated by appellants for the purpose of deceiving and tricking the public. (*Family Record Plan, Inc.* v. *Mitchell*, 172 Cal.App.2d 235 [342 P.2d 10]; *Grant* v. *California Bench Co.*, 76 Cal. App.2d 706 [173 P.2d 817]; *Southern Calif. Disinfecting Co.* v. *Lomkin*, 183 Cal.App.2d 431 [7 Cal.Rptr. 43].) Upon such question of fact the criteria, as always, are whether the findings of the trial court were supported by substantial evidence and were not arbitrary, capricious or otherwise contrary to law. (*Primm* v. *Primm*, 46 Cal.2d 690 [299 P.2d 231]; *Grainger* v. *Antoyan*, 48 Cal.2d 805 [313 P.2d 848]; *Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427 [45 P.2d 183]; *Owens* v. *White Memorial Hospital*, 138 Cal.App.2d 634 [292 P.2d 288].) A review of the record, including the numerous exhibits, convinces us that the findings were amply supported. It

is for the trier of fact and not the reviewing court in such proceedings to determine the precise impact of particular practices in trade, since "The point where a method of competition becomes 'unfair' . . . will often turn on the exigencies of a particular situation, trade practices, or the practical requirements of the business in question." (*Federal Trade Com.* v. *Motion Picture Adv. Co.*, 344 U.S. 392, 396 [73 S.Ct. 361, 97 L.Ed. 426].)

In attempting to justify the use of the material in question, appellants strongly emphasize the proposition that the location of "debt evaders" serves an economical purpose. In this connection, evidence was introduced at the trial that the dollar amount of delinquent accounts turned over to collection agencies in the State of California currently is in excess of $1 million a year, and that approximately 38 per cent of the delinquent accounts are concerned with people whose whereabouts are unknown; that the dollar amount of delinquent accounts turned over to collection agencies in the United States for collection currently is in excess of $1 billion a year; and that the failure to collect delinquent accounts seriously affects the economy of the State of California and of the United States, resulting in increased prices to the consumers. The argument then runs, that since the person sought to be tricked into revealing information is, in the vernacular, a "dead beat," the use of decoys and communications which are "less than candid" are justified. Similar arguments in support of subterfuge methods of locating debtors were made and rejected in *Silverman* v. *Federal Trade Com.*, *supra*, 145 F.2d 751; *Mohr* v. *Federal Trade Com.*, *supra*, 272 F.2d 401; and *Rothschild* v. *Federal Trade Com.*, *supra*, 200 F.2d 39. In *Rothschild*, the court said (page 42) : "The fact that acts and methods deemed deceptive are used to trap delinquent debtors does not prevent such acts and methods from being against the public interest. Some of the debtors may have had a justifiable reason for not promptly paying their obligations. And a considerable number of persons who receive cards and letters from petitioners are not debtors." We agree. Standards of fairness and honesty in trade should not be downgraded for any such reasons of economical expediency.

In the instant case, the trial court was entitled to take into consideration the large volume of forms sold by appellants and mailed to members of the public, and the likelihood of non-debtors receiving the material. It had before it numerous

letters of indignant inquiry and protest addressed to governmental agencies by recipients of the forms, as well as evidence of a number of telephone calls received at governmental offices in relation to them. From this and other evidence in the record, the trial court found that numerous persons were confused by such forms in believing that they came from the Department of Motor Vehicles and Department of Employment. This confusion, in turn, led to public hostility toward the departments, seriously imperiled the public acceptance of their mailings, and increased the cost of their operations. These findings that a large number of people who had received the forms were confused about them and addressed many letters of bitter protest to governmental agencies appear without controversion. And it is obvious that the confusion was aggravated by the intimation of prosecution for violation of penal provisions, printed in blackface type on the form, if the information demanded was not furnished.

The trial court was vested in equity with a wide discretion in determining the type of relief reasonably necessary under the facts as found to exist. That discretion was neither abused nor exceeded.

The judgment is affirmed.

Peek, P. J., and Schottky, J., concurred.